**CAPLIN &DRYSDALE, CHARTERED**
Jeffrey A. Liesemer
Kevin M. Davis
Lucas H. Self (*pro hac vice pending*)
Alec G. Schwartz
1200 New Hampshire Ave. NW, 8th Floor
Washington, DC 20036
Telephone: (202) 862-5000
Facsimile: (202) 429-3301
jliesemer@capdale.com
kdavis@capdale.com
lself@capdale.com
ascwartz@capdale.com
*Counsel to ACP Agency LLC and*
*Acme Credit Partners LLC*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In re: | Chapter 11 |
| SYNERGY REORG, LLC, *et al.*, | Case Nos. 26-464-ELG<br>26-465-ELG<br>26-466-ELG<br>26-467-ELG<br>26-468-ELG<br>26-469-ELG |
| Debtors.[1] | (Joint Administration Pending) |

**OBJECTION OF ACP AGENCY, LLC AND ACME CREDIT PARTNERS, LLC**
**TO THE DEBTORS' MOTION TO APPROVE COMPROMISE WITH JACK ROSS**

ACP Agency LLC and Acme Credit Partners LLC (collectively, "**ACP**"), by and through its undersigned counsel, hereby objects to the *Motion to Approve Compromise with Jack Ross*,

1 The debtors in these cases are Synergy Reorg, LLC.; Synergy CHC Corp.; Synergy CHC Inc.; Hand MD Corp.; Synergy CHC Mexico; and NomadChoice Pty, Ltd. (collectively, "**Debtors**").

dated September 7, 2026 (Dkt. No. 11) ("**Settlement Motion**").[2] The grounds supporting this objection are as follows.

## PRELIMINARY STATEMENT

The bankruptcies of these hopelessly insolvent Debtors have been filed for no other purpose to frustrate the rights of the Debtors' first priority secured lender, ACP, and to insulate the Debtors' CEO, Jack Ross, from scrutiny. By their Settlement Motion—*on the first day of the case*—the Debtors propose giving releases to Mr. Ross that would forfeit potentially millions of dollars in valuable claims that could benefit creditors. The claims not only include potential causes of action related to transfers made to Mr. Ross and his (or his family's) affiliated entities in the 12 months before the petition date, but also potentially valuable claims for breach of fiduciary duty, corporate waste, self-dealing, SEC violations, and more.

The Debtors' Settlement Motion contains no indication that any of these claims have undergone any serious investigation or valuation. Instead, it offers only a conclusory and non-specific description of a cursory investigation done by the Debtors' CRO, who was retained just days before the filing.

Indeed it is clear, getting Mr. Ross his release is the entire point of this case.[3] Given the Debtors' own admissions and the reality of the budget, the Debtors will be left with no option but

---

[2] Unless otherwise noted, "Dkt. No." refers to the docket in the lead case, *In re Synergy Reorg, LLC.*, 26-464-ELG.

[3] The Debtors have provided a 13-week budget that purports to show how a liquidation will be implemented and paid for. But that budget actually shows that the Debtors' intended use of cash collateral would benefit no one other than professionals and Mr. Ross. The budget estimate total receipts over the 13-week forecast of $538,868 with operating expenses of $318,137 and debtor professional fees of $284,476, resulting in an operating ***deficit*** of $63,745. Dkt. No. 9-3. This budget appears to include the $100,000 the Debtors would receive under this Settlement Motion. Thus, this bankruptcy will do nothing more than consume ACP's collateral to pay professionals and extinguish claims against the Debtors' CEO (at an eye-watering discount).

to convert the cases to chapter 7, at which time *nothing* in this case will have been accomplished except that Mr. Ross will have received obtained an illegitimate release.

By their own admission, the Debtors have no hope of reorganization; they seek to liquidate only existing inventory and accounts receivable. ACP has a claim of approximately $19 million secured by liens on all or substantially all of the Debtors' assets, which the Debtors represent to be worth approximately $3 million. This chapter 11 case is neither viable nor advisable. In the coming days, ACP will seek to expeditiously resolve this case in the way it should end: with conversion to chapter 7 and an orderly liquidation by an impartial trustee, a motion to lift the automatic stay to collect the collateral secured by ACP's liens, or both. For the reasons explained below, the proposed settlement is not fair and equitable and not in the best interests of the Debtors' estates and their creditors, including ACP. The Settlement Motion should be denied and the cases should be converted to chapter 7 now.

## FACTUAL BACKGROUND

### I. ACP's Secured Loan to the Debtors and Events of Default

On May 30, 2025, Debtor Synergy CHC Corp. ("**Synergy**"), the ultimate parent of all of the Debtors, as borrower (in such capacity, the "**Borrower**"), entered into a $17.5 million senior secured term facility with ACP Agency, LLC as administrative agent and collateral agent, and , ACME Credit Partners Fund I, LP, an affiliate of ACP Agency, LLC, as lender, which is guaranteed by Debtors Synergy CHC Inc. and Hand MD Corp. (together with Synergy, the "**Loan**

**Parties**"). This loan was secured by liens on substantially all assets of the Loan Parties.[4] The full amount of the $17.5 million was advanced to Synergy (and outstanding) by December 31, 2025.[5]

Synergy quickly went into default under the Credit Agreement in multiple respects. First, the Credit Agreement prohibited the Loan Parties from making interest payments on certain subordinated notes ("**Sanders Notes**") unless several conditions were satisfied, including that Synergy maintain a minimum liquidity amount of $2 million.[6] Though that liquidity condition was unmet, the Loan Parties made monthly interest payments on account of the subordinated Sanders Notes from June 2025 through January 2026, skipping only August.[7]

---

[4] Term Loan Credit Agreement, dated as of May 30, 2025, among Synergy CHC Corp., as Borrower, the Guarantors party thereto, ACME Credit Partners Fund I, LP, as Lender, and ACP Agency, LLC, as Administrative Agent and Collateral Agent (together with any amendments, joinders, and modifications, the "**Credit Agreement**"), attached as Ex. 1 to the Declaration of Peter Eschmann (the "**Decl.**"); Joinder Agreement, dated as of June 9, 2025, by and among the Borrower, Synergy CHC Inc., ACP Agency, LLC and Hand MD Corp., a Delaware corporation, as Additional Guarantor, Decl. Ex. 2.

[5] *See, e.g.*, Pledge and Security Agreement, dated as of May 30, 2025, by the Borrower and Synergy CHC Inc. in favor of ACP Agency, LLC, Decl. Ex. 3; Trademark Security Agreement, dated as of May 30, 2025, by the Borrower in favor of ACP Agency, LLC, recorded with the U.S. Patent and Trademark Office on May 30, 2025 at Reel/Frame 8883/0576 (covering, among others, FOCUS FACTOR, Reg. No. 2,414,522), Decl. Ex. 4; Canadian Security Agreement, dated as of May 30, 2025, Decl. Ex. 5; Canadian Guarantee, dated as of May 30, 2025, Decl. Ex. 6; Canadian Trademark Security Agreement, each dated as of May 30, 2025, Decl. Ex. 7; Canadian Notice of Security Interest in Intellectual Property, dated as of May 30, 2025, filed with the Canadian Intellectual Property Office, Decl. Ex. 8; UCC-1 Financing Statement, Initial Filing No. 2025478218-3 (Nevada Secretary of State, filed May 30, 2025) (Synergy CHC Corp.), Decl. Ex 9; UCC-1 Financing Statement, Initial Filing No. 2025 4127426 (Delaware Department of State, filed June 9, 2025) (Hand MD Corp.), Decl. Ex. 10; UCC-1 Financing Statement, Doc. No. 2025053272 (District of Columbia, filed May 30, 2025) (Synergy CHC Inc.), Decl. Ex. 11; Deposit Account Control Agreement, dated as of June 5, 2025, among the Borrower (d/b/a Factor Nutrition), ACP Agency, LLC and Banc of California ("**DACA**"), Decl. Ex. 12.

[6] Credit Agreement § 7.2(m)(ii)( C); see also Credit Agreement § 1.1, "Sanders Notes Interest Payment Conditions" definition.

[7] Notice of Events of Default, Decl. Ex. 13.

The Credit Agreement also required the Loan Parties to extend the maturity date of the Sanders Notes from 2026 to 2029, which the Loan Parties failed to do.[8] The Loan Parties were informed of the need to do so as soon as possible via email on August 26, 2025, and agreed to a form of amendment on August 31, but ultimately never delivered an executed copy.[9]

Second, on January 1, 2026: Boombod Ltd., "an entity 100% indirectly owned by Jack Ross,"[10] failed to pay a promissory note delivered to ACP, which triggered a requirement for Mr. Ross to deliver an equity pledge agreement pledging shares in Synergy's stock with a market value equal to the outstanding amount, which Mr. Ross failed to do, constituting a further Event of Default.[11]

ACP gave notice on February 2, 2026 of theseEvents of Default.[12] Synergy disputed all three defaults the next day.[13] Synergy further demanded that ACP rescind the notice as void *ab initio* and threatened lender-liability claims if ACP refused. ACP reiterated its default notice on February 4, 2026.[14]

---

8 Credit Agreement § 7.2(b) *see also*, Credit Agreement § 1.1, "Permitted Indebtedness" definition, clause (m), requiring that Subordinated Indebtedness "not mature prior to the date that is 91 days after the Stated Term Loan Maturity Date."

9 Decl. ¶ 6.

10 Synergy CHC Corp., Amendment No. 6 to Form S-1 (filed Oct. 10, 2024), Decl. Ex. 14.

11 Credit Agreement § 8.1(s).

12 Notice of Events of Default, Decl. .

13 Letter from W. David Mannheim, Nelson Mullins Riley & Scarborough LLP, to Tanner Frei, KTBS Law LLP, dated February 3, 2026, Decl. Ex. 17, at 1–2.

14 Decl. ¶ 11.

On February 2, 2026, the same day ACP sent the default notice, ACP demanded turnover of every interest payment on the Sanders Notes.[15] The Subordination Agreement between ACP and the holder of the Sanders Notes requires both that any improperly received distributions be delivered to ACP and that, until this is done, those distributions be held in trust by Sanders.[16] Those distributions were never received by ACP.

On March 24, 2026, ACP and Synergy entered into two agreements: the "Second Amendment," amending the terms of the Credit Agreement, and the "Limited Waiver," giving Synergy substantial relief from defaults it had already committed.[17] Through the Limited Waiver, ACP waived four specified Events of Default, including the three defaults identified in the February 2 notice and Synergy's missed March 2 cash interest payment.[18] ACP also waived the default interest triggered by those defaults.[19]

On April 1, 2026, ACP learned that, in the preceding months, Synergy entered into three cash advance agreements totaling approximately $5.7 million with Cedar Advance, LLC ("**Cedar**"). ACP determined tha two of these advances, made after the Loan Parties entered into the credit agreemetn constituted impermissible indebtedness under the Credit Agreement, and that the liens purported granted to Cedar by the cash advance agreements were also prohibited.[20]

---

[15] Demand for Turnover Under Subordination Agreement, dated February 2, 2026, from ACP Agency, LLC to Don A. Sanders and Sanders Morris Harris LLC (Attn: Steve Mangold), Decl. Ex. 15, at 1.

[16] Subordination Agreement, dated as of May 30, 2025, Decl. Ex. 16, §§ 2.2(a), 2.2(g).

[17] Limited Waiver to Term Loan Credit Agreement ("**Limited Waiver**"), dated as of March 24, 2026, Decl. Ex. 18; Second Amendment to Term Loan Credit Agreement ("**Second Amendment**"), dated as of March 24, 2026, Decl., Ex. 19.

[18] Limited Waiver, recitals and § 1.A.

[19] *Id.*

[20] Decl. ¶ 13.

On May 28, 2026, ACP entered into an agreement with Synergy (the "**Forbearance Agreement**") in which ACP notified Synergy that (i) the liens granted by Synergy in favor of Cedar, (ii) the indebtedness owed to Cedar, and (iii) the payments of that indebtedness made to Cedar each constituted an Event of Default.[21] ACP agreed to forbear these additional Events of Default, on the basis that the FOCUSfactor brand would be sold to Mountainview Consumer Products, LLC and the debt would be paid in full. In addition to certain data access rights for ACP,[22] the Forbearance Agreement also restricted payments to Cedar.[23] Synergy's reporting at this time assumed that ACP would be paid in full.[24] However, Synergy resisted in several instances when asked to comply with the Forbearance Agreement's reporting requirements.[25]

On July 15, 2026, Synergy discovered that Costco Wholesale had chosen to cease carrying Synergy's FOCUSfactor products in its stores.[26] In public filings, Synergy stated that the loss would have a "material adverse effect on the Company's business, results of operations, liquidity and financial condition," and that it was "evaluating available financing and other strategic alternatives.[27] Costco represented approximately 58% of Synergy's revenue.[28] The Credit Agreement required Synergy to inform ACP of "any event or development that could reasonably

---

[21] Forbearance Agreement, dated as of May 28, 2026, by and among the Borrower, the Guarantors, the Lenders party thereto and the Agents, Decl. Ex. 20.

[22] *Id.* § 1.C(iii)(a).

[23] *Id.* § 1.C(iii)(b).

[24] Synergy CHC Corp., Current Report on Form 8-K (May 11, 2026), Item 1.01 (Equity Purchase Agreement with Hudson Global Ventures, LLC, dated May 8, 2026), Decl. Ex. 21; Synergy CHC Corp., Quarterly Report on Form 10-Q for the quarter ended March 31, 2026 (filed May 14, 2026) ("Q1 2026 Form 10-Q"), Decl. Ex. 22, subsequent events.

[25] Decl. ¶ 14.

[26] Synergy CHC Corp., Current Report on Form 8-K (July 29, 2026), Item 8.01.

[27] *Id.*

[28] Decl. ¶ 15.

be expected to have a Material Adverse Effect" within three days.[29] Synergy did not tell ACP for five days.

ACP wrote to Synergy's full board on July 29, 2026, identifying this breach, together with the Company's failure to comply with the reporting requirements set out in the Forbearance Agreement—the last forecast ACP had received was dated June 22, 2026—the last forecast ACP had received was dated June 22, 2026—and setting out the board's fiduciary duties in the zone of insolvency, including the duty to be attentive to conflicts of interest that might benefit insiders and transactions that could be challenged as fraudulent transfers, including transfers to insiders or affiliates.[30]

On August 3, 2026, Synergy failed to make the interest payment required, which, on the expiration of the three-day cure period, constituted an Event of Default under the Credit Agreement.[31] Under the terms of the Forbearance Agreement, it also constituted a termination event, thus terminating the forbearance period and resulting in an approximately $400,000 forbearance fee becoming due.[32] This amount was not paid.

On August 11, 2026, ACP formally gave notice of default and terminated the Forbearance Agreement.[33] The same day, ACP requested that Synergy deliver a proposed release. On August 13, Synergy delivered a proposed draft release, purporting to release an unnamed "[officer]

[29] Credit Agreement § 7.1(a)(viii).

[30] Decl. ¶ 16.

[31] Credit Agreement § 8.1(a).

[32] Forbearance Agreement, dated as of May 28, 2026, §§ 1.A, 1.C(i), 1.C(iii)(c), 1.C(iv), 1.C(x).

[33] Notice of Forbearance Termination Event, dated August 11, 2026, from ACP Agency, LLC to Synergy CHC Corp. (Attn: Jack Ross), Decl. Ex. 24.

[director] [officer and director]" of Synergy from "all known and unknown claims" in exchange for their resignation, such that ACP could take control of Synergy.[34]

On August 18, 2026, ACP informed Synergy that it had exercised its right of control over Synergy's primary bank account at Banc of California under its deposit account control agreement ("**DACA**") and asked for the read-only access to the bank account required by the DACA.[35] It was not provided

ACP issued a Notice of Acceleration on August 25, 2026, terminating all commitments and declaring Synergy's obligations immediately due and payable.[36] A total of $18,898,424.70 was outstanding under the Credit Agreement as of August 21, 2026.[37]

## II. The Insider Transfers and Movement Of Funds

On information and belief, Synergy paid $3,873,848 to insiders in the 12 months before the petition date, approximately $2.70 million of it to Mr. Ross's family members and to entities he wholly owns, in contravention of a covenant that caps cash compensation at $1 million per

---

[34] Email from Peter Eschmann to Jack Ross, dated August 10, 2026; email from Trent MacDonald to Peter Eschmann and Jack Ross, dated August 11, 2026, 5:31 p.m.; emails from Peter Eschmann to Trent MacDonald, dated August 11, 2026, 5:44 p.m. and August 12, 2026, 2:02 p.m.; emails from Trent MacDonald to Peter Eschmann, dated August 11, 2026, 6:11 p.m. and August 12, 2026, 2:29 p.m.; and email from Trent MacDonald to Peter Eschmann, dated August 13, 2026, 9:34 a.m., Decl. Ex. 25; Proposed Release Agreement, dated August 13, 2026, Decl. Ex. 26.

[35] Emails, P. Eschmann to J. Fickett, copying A. Galan, subject "DACA," August 18, 2026, 4:12 p.m. ET; T. MacDonald to P. Eschmann, copying J. Fickett, J. Ross and A. Galan, subject "Re: DACA," August 19, 2026, 8:56 a.m. and 8:57 a.m. ET, each marked "WITHOUT PREJUDICE"; P. Eschmann to T. MacDonald, August 19, 2026, 9:16 a.m. ET; T. MacDonald to P. Eschmann, August 19, 2026, 9:33 a.m. ET, Decl. Ex. 27; DACA § 10.

[36] Notice of Acceleration, dated August 25, 2026, from ACP Agency, LLC to Synergy CHC Corp., Synergy CHC Inc. and Hand MD Corp. (Attn: Jack Ross), Decl. Ex. 28 at 1–2.

[37] Synergy CHC Corp., Current Report on Form 8-K (Aug. 26, 2026), Item 2.04 (signed by Jack Ross, Chief Executive Officer), Decl. Ex. 29.

fiscal year[38] and permits affiliate transactions only on arm's-length terms "fully disclosed to the Agents prior to the consummation thereof."[39] On information and belief, Mr. Ross has failed to comply with these covenants.

After the forbearance terminated when Synergy missed the required August 3, 2026 interest payment, ACP sent to the Banc of California a shifting control notice, which pursuant to the therms of the DACA, granted ACP exclusive control over Synergy's primary collection account at the Banc ("**U.S. DACA Account**"). This is permitted folling an Event of Default under section 7.1(j)(iv) of the Credit Agreement and the terms of the DACA. ACP was then informed that Mr. Ross was contacting Synergy's account debtors and instructing them to divert payments away from that U.S. DACA Account, which they had historically paid into, and into other accounts where ACP had no DACA.[40] The other accounts were Excluded Accounts under the Credit Agreement, not subject to the DACA requirement, only because they were required to be swept into the U.S. DACA Account.[41] ACP also saw funds moved out of the U.S. DACA Account to accounts in Canada and Mexico, in amounts that cannot be squared with the revenue generated in those jurisdictions.[42] When faced with these developments, ACP sent notification letters directing account debtors to pay ACP directly on receivables constituting proceeds of ACP's collateral.[43] Again, this is specifically permitted under section 6(d)(i) of the Pledge and Security Agreement.

---

[38] Credit Agreement § 7.2(h).

[39] Credit Agreement § 7.2(j).

[40] Decl. ¶ 23.

[41] *Id.*

[42] Decl. ¶ 24. In the past year Synergy has transferred over $2 million to the Canadian and Mexican entities, which upon information and belief, cannot be substantiated based on the level of sales in those two entities. These are distribution entities and should not require this level of investment nor was it permitted under the credit agreement. *Id.*

[43] Decl. ¶ 25.

ACP acted at all times consistent with the loan documents and in order to protect its interest in the property once it learned that Mr. Ross was diverting these funds.

**III. The Debtors' Bad Faith Bankruptcy Filings**

Without any prior notice to ACP, the Debtors filed for bankruptcy on September 4, 2026. Dkt. No. 1. Indeed, until the Debtors filed for bankruptcy, ACP was unaware of the existence of the entity Synergy Reorg, LLC ("**Synergy Reorg**"). On information and belief, Synergy Reorg was formed just days prior to the bankruptcy, on August 28, 2026, and has never generated any revenue, has no employees, and has no books or records. Its sole asset consists of approximately $200,000 in accounts receivable assigned to it days before the Debtors filed their chapter 11 petitions. *See* Dkt. No. 1 at 8. Synergy Reorg is the sole basis for venue in the District of Columbia under 28 U.S.C. § 1408(1); the other five follow it as affiliates. Scheduled assets across all six debtors show assets total only $3.87 million,[44] compared to the outstanding amount due to ACP under the Credit Agreement of approximately $18.9 million. By their own admission, the Debtors do not seek to reorganize; they seek to liquidate instead. Settlement Motion at 6. Yet, the budget that the Debtors propose, which appears to include the $100,000 the Debtors seek under the Settlement Motion, estimates total receipts over the 13-week forecast of $538,868 with operating expenses of $318,137 and debtor professional fees of $284,476 result in an operating *deficit* of

[44] *See* Petition (Case No. 26-464) (listing total assets of $204,267); Petition (Case No. 26-465) (listing total assets of $2,451,505); Petition (Case No. 26-466) (listing total assets of $1,175,573); Petition (Case No. 26-467) (listing total assets of $0); Petition (Case No. 26-468) (listing total assets of $723); Petition (Case No. 26-469) (listing total assets of $40,132).

$63,745. Dkt. No. 9-3. Thus, this bankruptcy does nothing more than consume ACP's collateral to pay professionals and extinguish claims against the Debtors' CEO.

On September 7, 2026, the Debtors filed the cursory Settlement Motion and sought to have it heard just three days later, on September 10, 2026. Dkt. No. 14. On September 8, 2026, the Court granted the Debtor's motion for shortened notice. Dkt. No. 18.

**ARGUMENT**

In accordance with Bankruptcy Rule 9019, "the Court may" under certain circumstances "approve a compromise or settlement" of estate-held claims. Fed. R. Bankr. P. 9019. Before approving a settlement, however, the Court must determine whether a settlement is "fair and equitable." *Protective Comm. for Indep. S'Holder of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *see also In re Nutraquest, Inc.*, 434 F.3d 639, 644 (3d Cir. 2006) ("Settlements are favored, but the unique nature of the bankruptcy process means that judges must carefully examine settlements before approving them.").

Before approving a settlement "the bankruptcy court should consider: (1) probability of success in the litigation; (2) difficulties, if any, with collection; (3) the complexity of the litigation, including the expense, inconvenience and delay attendant to the litigation; and (4) the interest of creditors." *Advantage Healthplan, Inc. v. Potter*, 391 B.R. 521, 554 (D.D.C. 2008*), aff'd sub nom. Greater Se. Cmty. Hosp. Found., Inc. v. Potter*, 586 F.3d 1 (D.C. Cir. 2009) (citing *TMT Trailer Ferry*, 390 U.S. at 425).

The Debtors bear the burden to show that the settlement is not only fair and equitable, but also "in the best interests of the estate and the [D]ebtor[s]." *In re NJ Affordable Homes Corp.*, No. 05-60442 (DHS), 2007 WL 4300153, at *2 (Bankr. D. N.J. Dec. 5, 2007); *see also In re Neshaminy Office Bldg. Assocs.*, 62 B.R. 798, 804 (E.D. Pa. 1986) ("[T]o meet its burden the trustee must establish that the proposed compromise is in the best interests of the estate. In this case, the trustee

has not presented sufficient evidence for a court to conclude that the compromise is in [the debtor's] best interest."). The 9019 Motion fails to meet this burden.

Moreover, "[t]he Supreme Court has instructed that an insider's dealings with a bankrupt corporation must be 'subjected to rigorous scrutiny.'" *Brewer v. Erwin & Erwin, P.C. (In re Marquam Inv. Corp.)*, 942 F.2d 1462, 1465 (9th Cir. 1991) (quoting *Pepper v. Litton*, 308 U.S. 295, 306 (1939)); *see also Citicorp Venture Cap., Ltd. v. Comm. of Creditors Holding Unsecured Claims (In re Papercraft Corp.)*, 211 B.R. 813, 823 (W.D. Pa. 1997) (citing *Pepper*, 308 U.S. at 306) ("[I]nsider transactions are subjected to rigorous scrutiny and when challenged, the burden is on the insider . . . to show the inherent fairness from the viewpoint of the corporation and those with interests therein.").

## I. The Proposed Settlement Does Not Meet the Heightened Scrutiny That Applies to Insider Transactions

The Court must subject the Debtors' proposed settlement to heightened scrutiny, as it is between the Debtors and its insider, Mr. Ross.[45] *See, e.g., In re NMI Sys., Inc.*, 179 B.R. 357, 367 (Bankr. D.D.C. 1995) ("An 'insider' generally is an entity whose close relationship with the debtor subjects any transactions made between the debtor and such entity to heavy scrutiny.") (internal quotations omitted); *In re Wigley*, 557 B.R. 678, 686 (B.A.P. 8th Cir. 2016) (affirming "the bankruptcy court's determination that the proposed Settlement was not 'fair and equitable and in the best interests of the estate'" where the settlement would provide "no benefit to the estate" while the only benefit would be to an insider); *In re Astria Health*, 623 B.R. 793, 801 (Bankr. E.D. Wash.

---

[45] Mr. Ross, the CEO of the Synergy and now its sole director, is an insider for purposes of 11 U.S.C. § 31(B)(ii) (defining "insider" to include "an officer of the debtor"). He also holds more than 20% of the outstanding shares of Synergy. 11 U.S.C. § 101(2) (defining "affiliate" to include any entity that "directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor"); *id*. § 101(31)(E) defining "insider" to include an "affiliate").

2021) ("Heightened scrutiny is warranted when an insider benefits from a compromise or release that a debtor in possession proposes on behalf of its bankruptcy estate.").

Heightened scrutiny requires, among other things, that the Court not defer to the Debtors' business judgment in assessing the proposed settlement. *In re Chassix Holdings, Inc.*, No. 15–10578 (MEW), 2015 WL 4122976, at *4 (Bankr. S.D.N.Y. July 9, 2015) (while "[o]rdinarily a settlement is reviewed under a 'business judgment' standard," where "the settlement . . . is with the Debtors' parent" the court would instead "apply 'heightened scrutiny and some skepticism' in considering the settlement terms" (quoting *JPMorgan Chase Bank v. Charter Commn'cs Operating, LLC (In re Charter Commn'cs)*, 419 B.R. 221, 240 (Bankr. S.D.N.Y. 2009))).

Consequently, the proposed settlement is subject to more rigorous scrutiny than a court might usually apply to a settlement with an unaffiliated third party; and this is especially the case where, as here, creditors were not involved in the negotiation or execution of the settlement. *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*, 68 F.3d 914, 918 (5th Cir. 1995) (noting courts should "should carefully scrutinize the agreement" when an insider settles without creditor input) (citing *In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. 493, 498 (S.D.N.Y. 1991) ("We subjected the agreement to closer scrutiny because it was negotiated with an insider, and hold that closer scrutiny of insider agreements should be added to the . . . factors [used] to determine whether a settlement is fair and reasonable.")); *accord In re Dow Corning Corp.*, 192 B.R. 415, 428 (Bankr. E.D. Mich. 1996) ("The case law clearly holds that when a debtor in possession seeks to settle a dispute with its parent company or with another related party, the court should give greater scrutiny than in the usual case.").

Accordingly, to approve the proposed settlement, the Court must not only determine that the settlement's terms are fair and reasonable, but also that the process leading to the settlement

was fair and reasonable, without taking into account the Debtors' business judgment. *See Adelphia Commc'ns Corp v. Rigas (In re Adelphia Commc'ns Corp.)*, 323 B.R. 345, 385-86 (Bankr. S.D.N.Y. 2005) (under heightened scrutiny, court must examine "dual components—one procedural and one substantive"). On the process side, "the court must consider whether the board made the necessary investigation and undertook due deliberation with respect to the decision the board made" before turning to the substantive side: whether the settlement "is defensible on the merits." *Id.*

**A. *The Debtors Have Not Shown that the Proposed Settlement is Procedurally Fair***

On process grounds alone, the Settlement Motion must fail. It is not clear what, if any investigation, was done by the Debtors' proposed CRO, who was retained on August 26, 2026—only seven business days before the proposed settlement agreement with Mr. Ross was executed. Dkt. Nos. 8-1 ¶ 6, 11-1 at 5. The Settlement Motion states only that the proposed CRO, "was given every book and record she requested and offered answers to her questions." Dkt. No. 11-1 at 2. The Settlement Motion makes no mention of the time spent during any investigation, the details of the materials that proposed CRO received, or mention of whom she interviewed. Nor does it discuss what parties related to Mr. Ross she investigated or the potential causes of action that she examined. The Debtors have not disclosed who hired the proposed CRO, what decision-making authority, if any, she had regarding the proposed settlement, and whether Mr. Ross had any involvement with her retention or the Debtors' decision to settle. Thus, it is not clear that the proposed settlement is procedurally fair. It is thus impossible to determine at this stage that the Debtors "made the necessary investigation and undertook due deliberation" when assessing the merits of this insider settlement. *Adelphia*, 323 B.R. at 385-86.

### B. *The Debtors Have Failed to Show that the Settlement Resulted in a Fair Price*

Contrary to their assertions (Settlement Motion at 3), the Debtors have not established that they have settled their claims for a fair price because they have failed to provide any basis for valuing the claims that they now seek to settle. "[T]he proponent of a settlement has the burden of proving its reasonableness." *In re Biolitec, Inc.*, 528 B.R. 261, 267 (Bankr. D.N.J. 2014). As a result, courts regularly reject settlements where, as here, the proponent fails to provide sufficient evidence supporting the fairness of a proposed settlement to the estate and its creditors. *See, e.g.*, *Velde v. First Int'l Bank & Tr. (In re Y-Knot Constr., Inc.),* 369 B.R. 405, 408 (B.A.P. 8th Cir. 2007) (reversing bankruptcy court's grant of settlement motion because parties did not introduce evidence from which bankruptcy court could have determined reasonableness of settlement agreement).[46]

In particular, courts reject proposed settlements where the settlement proponent fails to provide "any credible evidence of the potential recovery being given up." *In re Diocese of Camden*, 653 B.R. 722, 742, 745 (Bankr. D.N.J. 2023). Without such evidence, it is "not possible to determine whether the Debtor's decision to settle the [action] was fair and equitable[.]" *Id.* at 742 (denying 9019 motion where proponent failed to produce quality evidence regarding the value of claims being settled). Where, as here, a court is left with insufficient "explanation regarding the specific potential claims at issue" underlying a proposed settlement, court approval must be

[46] *See also In re Smith*, 349 B.R. 28, 38 (Bankr. D. Idaho 2005) (rejecting settlement where trustee failed to demonstrate propriety of settlement, and most of testimony provided by trustee's witness on probability of success was subjective opinion); *In re Lion Cap. Grp.*, 49 B.R. 163, 189 (Bankr. S.D.N.Y. 1985) (noting that the "inability to canvass the issues pertaining to the Trustee's causes of action against Bradford other than strong probability of success . . . leaves us in the position of being unable to find that the Settlement is in the best interests of creditors"); *In re HyLoft, Inc.*, 451 B.R. 104, 116–17 (Bankr. D. Nev. 2011) (rejecting settlement where trustee had not provided court with information it needed to find that settlement would result in maximum benefit to debtor's bankruptcy estate).

denied. *See MarkWest Liberty Midstream & Res., LLC v. Meridien Energy, LLC*, No. 3:23CV593 (DJN), 2024 WL 3345342, at *18 (E.D. Va. July 9, 2024) (overturning bankruptcy court's order granting 9019 motion because of lack of information regarding claims to be settled, such that court could not conclude 9019 factors were satisfied). Accordingly, this Court should deny approval of the proposed settlement.

The Debtors provide no basis for establishing that the proposed $100,000 settlement amount is justified on the merits. They provide no analysis of particular claims at issue, their probability of success, or the likelihood of recovery. Contrary to the Debtors' contention that "no genuine rights are being bartered away" (Settlement Motion at 3), on information and belief Mr. Ross transferred over $3 million in assets to entities controlled by him within one year of the petition date, which falls within the one-year preference period for insiders and the two-year reach-back for fraudulent transfers. 11 U.S.C. §§ 547(b)(4)(B), 548(a)(1).

Moreover, there may well be other claims arising out of Mr. Ross's course of conduct, which includes apparent attempts to direct monies away from accounts subject to ACP's DACA and to evade ACP's liens by moving funds outside the country.[47] There could also be claims arising out of Mr. Ross's mismanagement of the Debtors. Such claims may include, at a minimum, potential claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, self-dealing, and corporate waste. Thse claims would be forever released under the terms of the proposed settlement agreement. Dkt. 11-1. Yet, there is no discussion or analysis of such claims in the Settlement Motion. Accordingly, the Debtors cannot show that the proposed settlement is "defensible on the merits." *Adelphia*, 323 B.R. at 385-86.

---

[47] Decl. ¶ 23-24.

## II. The Debtors Have Not Met Their Burden Under the *TMT Trailer* Factors

Even if this Court were to apply the traditional *TMT* factors alone, the Settlement Motion must fail. *See Advantage Healthplan, Inc. v. Potter*, 391 B.R. at 554 (noting factors the Court should consider include "(1) probability of success in the litigation; (2) difficulties, if any, with collection; (3) the complexity of the litigation, including the expense, inconvenience and delay attendant to the litigation; and (4) the interest of creditors") (citing *TMT Trailer Ferry*, 390 U.S. at 425).

### A. *Probability of Success on the Merits*

As explained above, the Debtors have not provided any basis to evaluate the claims that they seek to settle. They provide no analysis of particular claims at issue (preferential transfer, fraudulent transfer, breach of fiduciary duty, others?) or their probability of success if litigation ensued. For these reasons, the proposed settlement fails to satisfy the first *TMT Trailer* factor.

### B. *Difficulties of Collection*

The Debtors have provided *no evidence* regarding any difficulties of collection against Mr. Ross. Indeed, the Debtors admit that "the finances of Mr. Ross *are largely unknown* and *have not formed a material portion of [the CRO's] business judgment* in entering into the Agreement." Settlement Motion at 5 (emphasis added). In other words, the Debtors and their newly minted CRO did *nothing* to adduce relevant facts that would inform this second *TMT Trailer* factor. This is a critical deficiency in the evidentiary basis for approving this proposed settlement. A Rule 9019 motion requires the Court to assess the probability of collection on any judgment, yet the Debtors are asking the Court to approve a $100,000 settlement without any meaningful analysis of Mr. Ross's actual financial condition, assets, or ability to satisfy a larger judgment. The absence of D&O insurance cuts both ways: while it removes one collection avenue, it does not establish that Mr. Ross lacks personal assets sufficient to satisfy a judgment. Without a proper financial

investigation, the Court cannot determine whether $100,000 represents a reasonable fraction of a collectible judgment or a dramatic undervaluation of the estate's claims.

Moreover, the Debtors have not argued that Mr. Ross is insolvent or that his assets are fully encumbered. *See Diocese of Camden*, 653 B.R. at 744 (rejecting settlement where there was no proof any of the settling entities would be insolvent in the future). Instead, they simply dismiss this *TMT Trailer* factor by stating that collection "is always a finicky and difficult task" and that there is no reason to think that "Mr. Ross would simply cut a check" to pay any judgment entered against him. Settlement Motion at 5. These bare and dismissive statements, together with the wholesale failure to investigate Mr. Ross's finances, support denial of the Settlement Motion.

**C. *Complexity of Litigation***

Complexity of litigation, standing alone, is not a sufficient basis to settle estate claims at a potentially significant discount without first conducting a thorough investigation. The Debtors conflate the difficulty of litigation with the merits of the underlying claims. While the transfers in question could be complex, the Debtors' estates have access to discovery tools that were unavailable prepetition, including Rule 2004 examinations, that could efficiently develop the factual record. Furthermore, the Settlement Motion's bare assertion that claims would need to be "horrendously complex" to succeed (Settlement Motion at 5) is speculative and unsupported by any legal analysis. If the claims are truly so weak that only extraordinarily complex theories could succeed, that is a factor already captured under the probability-of-success prong—not an independent reason to settle. The complexity argument, as framed, essentially double-counts the weakness-of-claims factor rather than providing an independent basis for settlement approval.

**D. *Interests of Creditors***

The proposed settlement provides no value to any creditors, especially ACP which already has perfected liens on essentially all or substantially of the Debtors' assets. This fact alone justifies

denial of the 9019 Motion. Courts "typically give proper deference to [the claimants'] reasonable views." *In re Interstate Cigar Co.*, 240 B.R. 816, 825 (Bankr. E.D.N.Y. 1999). Here, ACP as secured lender believes that a settlement to partially fund a liquidation of secured collateral that could simply be turned over to ACP and to release claims that could otherwise be pursued is patently unreasonable.

The Debtors' best-interests argument relies heavily on speculative harms—specifically, the threat of an indemnity demand from Mr. Ross and the prospect of litigation chaos (Settlement Motion at 6)—rather than a concrete showing that $100,000 represents fair value for the claims being released. The proposed release covers all claims from the beginning of time through the petition date, which is an extraordinarily broad release that would extinguish not only potential avoidance and fiduciary duty claims but potentially any other claims that may be discovered as the cases proceed. The argument that Mr. Ross's cooperation and institutional knowledge justify the settlement (Settlement Motion at 6) conflates two separate considerations: his apparently ongoing roles as CEO (for which he is presumably being compensated) and sole director and the settlement of prepetition claims. Creditors are entitled to both Mr. Ross's cooperation as a debtor-in-possession fiduciary and a full accounting of any claims against him—these need not be traded off against each other. Moreover, the indemnity threat is not a legitimate basis for discounting estate claims; if Mr. Ross's indemnity rights are contractual or statutory, they exist independently of whether claims are brought against him, and settling claims to avoid triggering indemnity demands may itself constitute a breach of the Debtors' fiduciary duties to creditors.

## III. Alternatively, the Court Should Defer Ruling on the Debtors' Settlement Motion

ACP respectfully asserts that the Court should deny the Settlement Motion outright based on the Debtors' failure to meet any of their burdens under Rule 9019. Mr. Ross's and the Debtors' stratagems in filing their chapter 11 petitions and proposing an inadequate settlement should not

be rewarded by further litigation resulting in diminution of ACP's collateral. Alternatively, if the Court does not deny the Settlement Motion outright, the Court should defer ruling on the Settlement Motion until ACP can fully respond and submit all evidence for this Courts' consideration. *See TMT Trailer*, 390 U.S. at 424 ("There can be no informed and independent judgment as to whether a proposed compromise is fair and equitable until the bankruptcy judge has apprised [herself] of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated.").

## RESERVATION OF RIGHTS

ACP expressly reserves the right to supplement or amend this objection based on its ongoing investigation and review of documents.

## CONCLUSION

For these reasons set forth above, the Court should deny the Settlement Motion.

Dated: September 9, 2026

Respectfully submitted,

**CAPLIN & DRYSDALE, CHARTERED**

*/s/ Kevin M. Davis*

Jeffrey A. Liesemer
Kevin M. Davis
Lucas H. Self (*pro hac vice* pending)
Alec G. Schwartz
1200 New Hampshire Ave NW, 8th Floor
Washington, DC 20036
Telephone: (202) 862-5000
Facsimile: (202) 429-3301
jliesemer@capdale.com
kdavis@capdale.com
lself@capdale.com
aschwartz@capdale.com

*Counsel to ACP Agency LLC and*
*Acme Credit Partners LLC*