# EXHIBIT 23

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# FORM 8-K

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d) of the**
**Securities Exchange Act of 1934**

Date of Report (Date of earliest event reported): July 15, 2026

**SYNERGY CHC CORP.**
(Exact name of registrant as specified in its charter)

| **Nevada** | **001-42374** | **99-0379440** |
|---|---|---|
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| **770 Roosevelt Trail STE 8 #1016, N. Windham, Maine** | **04062** |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: **(207) 321-2350**

N/A
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| **Title of each class** | **Trading Symbol(s)** | **Name of each exchange on which registered** |
|---|---|---|
| **Common Stock, par value $0.00001 per share** | **SNYR** | **The Nasdaq Stock Market LLC** |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (17 CFR § 230.405) or Rule 12b-2 of the Securities Exchange Act of 1934 (17 CFR § 240.12b-2).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 8.01. Other Events.**

On July 15, 2026, Costco Wholesale Corporation ("Costco") informed Synergy CHC Corp. (the "Company") that Costco will discontinue carrying the Company's FOCUSfactor products. Costco has been a significant customer of the Company for more than 16 years.

Costco accounted for approximately 58% of the Company's net revenue during the fiscal year ended December 31, 2025. The Company expects Costco's decision to have a material adverse effect on the Company's business, results of operations, liquidity and financial condition and is evaluating available financing and other strategic alternatives.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Date: July 29, 2026

**SYNERGY CHC CORP.**

By: */s/ Jack Ross*
Name: Jack Ross
Title: Chief Executive Officer

# EXHIBIT 24

**ACP AGENCY, LLC**
c/o Acme Credit Partners, LLC
600 Lexington Ave, 14th Floor
New York, New York 10022

August 11, 2026

**VIA EMAIL AND FEDEX**

Synergy CHC Corp.
P.O. Box 22
Sebago, ME 04029
Attention: Jack Ross
Email: jack@synergychc.com

**Re: Notice of Events of Default; Notice of Forbearance Termination Event; Reservation of Rights**

Ladies and Gentlemen:

Reference is made to (i) that certain Term Loan Credit Agreement, dated as of May 30, 2025, by and among Synergy CHC Corp., a Nevada corporation, as the borrower ("**Borrower**"), together with each other direct or indirect subsidiary of the Borrower listed as a "Guarantor" on the signature pages thereto and (together with each other Person (as defined therein) that executes a joinder agreement and becomes a "Guarantor" thereunder, each a "**Guarantor**" and collectively, the "**Guarantors**"), ACME Credit Partners Fund I, LP, as lender (in such capacity and together with its successors and assigns in such capacity, the "**Lender**"), ACP Agency, LLC ("**ACP**") as administrative agent for the Lender (in such capacity, together with its successors and assigns in such capacity, the "**Administrative Agent**"), and ACP, as collateral agent for the Lender (in such capacity, together with its successors and assigns in such capacity, the "**Collateral Agent**", and together with the Administrative Agent, each, an "**Agent**" and collectively, the "**Agents**"), as amended by that certain First Amendment to Term Loan Credit Agreement, dated as of June 24, 2025, that certain Second Amendment to Term Loan Credit Agreement, dated as of March 24, 2026, and that certain Limited Waiver to Term Loan Credit Agreement, dated as of March 24, 2026 (as so amended and as otherwise amended, restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**") and (ii) that certain Forbearance Agreement, dated as of May 28, 2026 (the "**Forbearance Agreement**"), by and among the Borrower, the Guarantors, the Lenders party thereto and the Agents. Any capitalized term used herein and not otherwise defined herein are used herein as defined in the Credit Agreement or, if not defined therein, the Forbearance Agreement.

Pursuant to Section 2.4(c) of the Credit Agreement, interest on each Loan shall be payable monthly in cash, in arrears, on the first day of each month, and pursuant to Section 4.1(a) of the Credit Agreement. The Borrower failed to pay the interest payment when due on August

3, 2026[1] (the "**August Interest Payment**"), and such failure constitutes an Event of Default under Section 8.1(a)(i) of the Credit Agreement as of the expiration of the three (3) Business Day cure period provided for therein, as of August 6, 2026 (the "**Payment Event of Default**").

Pursuant to Section 1.C(i) of the Forbearance Agreement, the occurrence and continuation of an Event of Default, other than the Alleged Events of Default (as defined in the Forbearance Agreement), constitutes a Forbearance Termination Event. The Payment Event of Default is an Event of Default other than the Alleged Events of Default, and therefore constitutes a Forbearance Termination Event. Accordingly, pursuant to Section 1.A of the Forbearance Agreement, on August 6, 2026 the Forbearance Period terminated and the Forbearance Termination Time occurred, immediately and automatically upon the occurrence of the Payment Event of Default, and the Forbearance is of no further force or effect.

As provided in Section 1.C(iv) of the Forbearance Agreement, the Forbearance did not constitute a waiver of the Alleged Events of Default, and the Alleged Events of Default constitute Events of Default that have occurred and are continuing under the Credit Agreement and, as of the Forbearance Termination Time, are no longer subject to any forbearance, standstill or other agreement of the Agents or the Lender. The Payment Event of Default and the Alleged Events of Default are referred to herein collectively as the "**Specified Events of Default**".

Pursuant to Section 1.C(iii)(c) of the Forbearance Agreement, upon the earlier of the Forbearance Termination Time and the consummation of the Proposed Transaction, the Borrower is required to pay to the Agents a fee, which fee was deemed fully earned as of the Forbearance Effective Time, equal to (i) $500,000, minus (ii) the aggregate amount of any optional or mandatory prepayments of outstanding principal of the Loan made during the Forbearance Period (excluding, for the avoidance of doubt, any scheduled amortization payments pursuant to Section 2.3(a) of the Credit Agreement), and which fee shall in no event be less than $100,000 (the "**Forbearance Fee**"). The Forbearance Termination Time having occurred, the Forbearance Fee in the amount of $404,173.06 is due and payable, and the Agents hereby demand payment of the Forbearance Fee.

Since the Specified Events of Default have occurred and are continuing, the Agents and the Lender are entitled to exercise various rights and remedies under the Loan Documents and applicable law, including, but not limited to, pursuant to Section 2.4(b) of the Credit Agreement, to charge interest on the principal of, and all accrued and unpaid interest on, all Loans, fees, indemnities or any other Obligations of the Loan Parties under the Credit Agreement and the other Loan Documents, from the occurrence of the first Event of Default, at a rate per annum equal at all times to the Post-Default Rate. Pursuant to Section 2.4(b) of the Credit Agreement, the Lender hereby gives notice to the Loan Parties that interest at the Post-Default Rate will be charged on the principal of, and all accrued and unpaid interest on, all Loans, fees, indemnities or any other Obligations of the Loan Parties under the Credit Agreement and the other Loan

[1] Section 4.1(a) of the Credit Agreement provides that "[w]henever any payment to be made under any such Loan Document shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall in such case be included in the computation of interest or fees, as the case may be."

Documents from November 12, 2025, being the date of the occurrence of the first Specified Event of Default.

In addition to the Specified Events of Default, there may be other Defaults or Events of Default that have occurred and are continuing of which the Lender is not aware.

Pursuant to Section 11.4 of the Credit Agreement, the Borrower is required to pay the reasonable and documented costs and expenses incurred by or on behalf of the Agent, including, without limitation, reasonable and documented fees, costs, client charges and expenses of counsel for the Agents, relating to, among other things, the preservation and protection of the Agents' or any of the Lenders' rights under the Credit Agreement or the other Loan Documents. Failure to make such required payment within three (3) Business Days of a written demand would constitute an Event of Default under Section 8.1(a)(i) of the Credit Agreement.

The Lender will continue to monitor the default situation very carefully and will evaluate, in its sole discretion, its response to the Specified Events of Default on a "day-by-day" basis and nothing in this letter or in any ongoing discussions or negotiations between the Lender, on the one hand, and the Borrower and the other Loan Parties, on the other hand, nor any delay on the part of the Lender in exercising any of its respective rights and remedies under the Credit Agreement, the other Loan Documents and/or applicable law, shall directly or indirectly create any obligation to forbear from taking any enforcement action, constitute a consent to or waiver of any past, present or future Default or Event of Default or constitute a course of dealing or other basis for altering any rights or obligations of the Lender under the Loan Documents or any Obligations of the Borrower or any other Loan Party under the Credit Agreement, the other Loan Documents or any other contract or instrument. Nothing contained in this letter shall confer on any Borrower or any other Loan Party or Person any right to notice or cure periods with respect to any Event of Default.

The Lender has not waived the Specified Events of Default and the Lender expressly reserves all of its rights, powers, privileges and remedies under the Credit Agreement, the other Loan Documents and/or applicable law, including, without limitation, its right at any time, as applicable, (i) to charge interest at the Post-Default Rate, as referenced above, (ii) to accelerate the Obligations, (iii) to take any other enforcement action or otherwise exercise any or all rights and remedies provided by any or all of the Credit Agreement, the other Loan Documents or applicable law, (iv) to reject any forbearance, financial restructuring or other proposal made by or on behalf of the Borrower, any other Loan Party or any creditor or equity holder, and (v) to demand, charge and collect the Forbearance Fee and all other Obligations. The Lender may exercise its rights, powers, privileges and remedies, including those set forth above at any time in its sole and absolute discretion without further notice.

No oral representations or course of dealing on the part of the Lender or any of its officers, employees or agents, and no failure or delay by the Lender with respect to the exercise of any right, power, privilege or remedy under any of the Credit Agreement, other Loan Documents or applicable law shall operate as a waiver thereof, and the single or partial exercise

of any such right, power, privilege or remedy shall not preclude any later exercise of any other right, power, privilege or remedy.

[*Remainder of page intentionally left blank.*]

Very truly yours,

**AGENT:**

**ACP AGENCY, LLC**

By: ______________________________
Name: Peter Eschmann
Title: Authorized Person

**LENDER:**

**ACME CREDIT PARTNERS FUND I, LP**

By: Acme Credit Investors LLC, its general partner

By: Acme Credit Partners LLC, its managing member

By: ______________________________
Name: Peter Eschmann
Title: Managing Partner

cc: Nelson Mullins Riley & Scarborough LLP
One Financial Center, Suite 3500
Boston, MA 02111
Attention: James W. Bartling, Esq.
Telephone: (617) 217-4692
Email: jim.bartling@nelsonmullins.com

# EXHIBIT 25

**Ariel Hayes**

**From:** Trent MacDonald, CPA, CA <trent@synergychc.com>
**Sent:** Thursday, August 13, 2026 9:34 AM
**To:** Peter Eschmann
**Cc:** Jack Ross; Jaime Fickett; James Gale
**Subject:** Re: Requested call
**Attachments:** Release Agreement (Clean Copy).docx

**WITHOUT PREJUDICE**

Hi Peter

Please find attached a DRAFT of the Release Agreement. The Company is currently reviewing as well but wanted to get it into your hands as quickly as possible.

Regards

Trent

synergy CHC corp.

**Trent MacDonald** CPA, CA
Senior Advisor
trent@synergychc.com
Phone: 416-230-1126

SYNERGYCHC.COM NASDAQ (SNYR)

FOCUSfactor FLAT TUMMY HAND MD

---

**From:** Trent MacDonald, CPA, CA <trent@synergychc.com>
**Sent:** Wednesday, August 12, 2026 5:39 PM
**To:** Peter Eschmann <peschmann@acmecreditpartners.com>
**Cc:** Jack Ross <jack@synergychc.com>; Jaime Fickett <jfickett@synergychc.com>; James Gale <james.gale@signethp.com>
**Subject:** Re: Requested call

**WITHOUT PREJUDICE**

Hi Peter

We have notified the Board of your meeting request and default notice.

The Board recently met with applicable management, advisors and legal counsel, out of which a resolution was passed empowering management to develop and execute a plan of action, which would include negotiations with senior lenders, on a possible path forward that could result in not having to make a filing with the US Bankruptcy Court. If unsuccessful, in managements judgement, the Board has also empowered management to make such filing, and all Board members have pre-tendered their resignations should that occur. As a result, the Board is not prepared to meet with you at this time.

As per your email earlier today, pending the draft release agreement, which we expect tomorrow, we await a much more detailed response to our emails of yesterday regarding the suggested paths forward currently on the table.

The only Nasdaq and SEC correspondence are attached and were publicly disclosed.

Regards

Trent

synergy CHC corp.

**Trent MacDonald** CPA, CA

Senior Advisor

trent@synergychc.com
Phone: 416-230-1126

SYNERGYCHC.COM NASDAQ (SNYR)

FOCUSfactor FLAT TUMMY HAND MD

---

**From:** Peter Eschmann <peschmann@acmecreditpartners.com>
**Sent:** Wednesday, August 12, 2026 4:12 PM
**To:** Trent MacDonald, CPA, CA <trent@synergychc.com>; Jack Ross <jack@synergychc.com>
**Cc:** James Gale <james.gale@signethp.com>; Jaime Fickett <jfickett@synergychc.com>
**Subject:** RE: Requested call

Where are you with organizing a call with the board and lenders as we have requested yesterday.

Also, can you provide any and all correspondence with the SEC and Nasdaq.

**From:** Trent MacDonald, CPA, CA <trent@synergychc.com>
**Sent:** Wednesday, August 12, 2026 2:29 PM
**To:** Peter Eschmann <peschmann@acmecreditpartners.com>; Jack Ross <jack@synergychc.com>
**Cc:** James Gale <james.gale@signethp.com>; Jaime Fickett <jfickett@synergychc.com>
**Subject:** Re: Requested call

**WITHOUT PREJUDICE**

Hi Peter

We were able to connect with David Mannheim today and expect the draft tomorrow.

Regards

Trent

synergy CHC corp.

**Trent MacDonald** CPA, CA
Senior Advisor

trent@synergychc.com
Phone: 416-230-1126

SYNERGYCHC.COM NASDAQ (SNYR)

FOCUSfactor FLATTUMMY HAND MD

---

**From:** Peter Eschmann <peschmann@acmecreditpartners.com>
**Sent:** Wednesday, August 12, 2026 2:02 PM
**To:** Trent MacDonald, CPA, CA <trent@synergychc.com>; Jack Ross <jack@synergychc.com>
**Cc:** James Gale <james.gale@signethp.com>; Jaime Fickett <jfickett@synergychc.com>
**Subject:** RE: Requested call

When can we expect to get the release – once we do we can respond to your proposal

---

**From:** Trent MacDonald, CPA, CA <trent@synergychc.com>
**Sent:** Tuesday, August 11, 2026 7:02 PM
**To:** Peter Eschmann <peschmann@acmecreditpartners.com>; Jack Ross <jack@synergychc.com>
**Cc:** James Gale <james.gale@signethp.com>; Jaime Fickett <jfickett@synergychc.com>
**Subject:** Re: Requested call

**WITHOUT PREJUDICE**

Hi Peter

Just to clarify, I did not suggest current management is required to sell the public company shell, not remotely. I did however suggest that regardless of who is managing the public company, it still has $30M of debt and is in default with all lenders and creditors. All creditors (beyond senior) have the legal right to take all actions to collect .... and they will. D&O will be impossible under the circumstance. As long as these facts remain, the shell has no value. There are plenty of much cleaner, debt free shells on the market. If the Company gets delisted, then it is truly a moot point. It hasn't yet filed its quarterly report as it is out of money to do so.

We are simply suggesting an alternative path that could work.

Regards

Trent

synergy CHC corp.

**Trent MacDonald** CPA, CA

Senior Advisor

trent@synergychc.com
Phone: 416-230-1126

SYNERGYCHC.COM NASDAQ (SNYR)

FOCUSfactor FLAT TUMMY HAND MD

---

**From:** Peter Eschmann <peschmann@acmecreditpartners.com>
**Sent:** Tuesday, August 11, 2026 6:27 PM
**To:** Trent MacDonald, CPA, CA <trent@synergychc.com>; Jack Ross <jack@synergychc.com>
**Cc:** James Gale <james.gale@signethp.com>; Jaime Fickett <jfickett@synergychc.com>
**Subject:** Re: Requested call

Answering both your questions. Acme/lenders can step in and do the same rto you are proposing with proceeds going to the proper stakeholders in the waterfall. Do not see management as necessary to do the transition you are proposing.

---

**From:** Trent MacDonald, CPA, CA <trent@synergychc.com>
**Sent:** Tuesday, 11 August 2026 18:17:35
**To:** Peter Eschmann <peschmann@acmecreditpartners.com>; Jack Ross <jack@synergychc.com>

**Cc:** James Gale <james.gale@signethp.com>; Jaime Fickett <jfickett@synergychc.com>
**Subject:** Re: Requested call

**WITHOUT PREJUDICE**

Hi Peter

Did you mean to send this email again? Your email of last evening was also sent twice.

Trent

synergy CHC corp.

**Trent MacDonald** CPA, CA
Senior Advisor

trent@synergychc.com
Phone: 416-230-1126

SYNERGYCHC.COM NASDAQ (SNYR)

FOCUSfactor FLAT TUMMY HAND MD

---

**From:** Peter Eschmann <peschmann@acmecreditpartners.com>
**Sent:** Tuesday, August 11, 2026 6:12 PM
**To:** Trent MacDonald, CPA, CA <trent@synergychc.com>; Jack Ross <jack@synergychc.com>
**Cc:** James Gale <james.gale@signethp.com>; Jaime Fickett <jfickett@synergychc.com>
**Subject:** RE: Requested call

Acme has a first lien on all assets of the company including proceeds from any sale of the public shell.

---

**From:** Trent MacDonald, CPA, CA <trent@synergychc.com>
**Sent:** Tuesday, August 11, 2026 6:11 PM
**To:** Peter Eschmann <peschmann@acmecreditpartners.com>; Jack Ross <jack@synergychc.com>
**Cc:** James Gale <james.gale@signethp.com>; Jaime Fickett <jfickett@synergychc.com>
**Subject:** Re: Requested call

**WITHOUT PREJUDICE**

Hi Peter

David Mannheim was out of office since Friday. We will be speaking with him tomorrow and will turn it around as quickly as possible.

The plan we put forth was meant to assist in maximizing the value of the assets for the benefit of senior lenders. Any sale of the shell through an RTO, or other means, would be a moot point in the event $30M of debt remains, as it would have no value.

Regards

Trent

synergy CHC corp.

**Trent MacDonald** CPA, CA
Senior Advisor

trent@synergychc.com
Phone: 416-230-1126

SYNERGYCHC.COM NASDAQ (SNYR)

FOCUSfactor FLAT TUMMY HAND MD

---

**From:** Peter Eschmann <peschmann@acmecreditpartners.com>
**Sent:** Tuesday, August 11, 2026 5:44 PM
**To:** Trent MacDonald, CPA, CA <trent@synergychc.com>; Jack Ross <jack@synergychc.com>
**Cc:** James Gale <james.gale@signethp.com>; Jaime Fickett <jfickett@synergychc.com>
**Subject:** RE: Requested call

Where is the release that you said would be provided to us by noon today?

Acme has a lien on all assets of the company which would include any value the public shell may have in a sale.

---

**From:** Trent MacDonald, CPA, CA <trent@synergychc.com>
**Sent:** Tuesday, August 11, 2026 5:31 PM
**To:** Peter Eschmann <peschmann@acmecreditpartners.com>; Jack Ross <jack@synergychc.com>
**Cc:** James Gale <james.gale@signethp.com>; Jaime Fickett <jfickett@synergychc.com>
**Subject:** Re: Requested call

**WITHOUT PREJUDICE**

Hi Peter and Jim

Apologies for having missed the meeting yesterday. I was having technical difficulties getting onto Teams from my phone as I was travelling.

In addition to your email below, I was also briefed by Jack and Jamie on the conversation.

As the Company has continued to communicate, it will do everything possible to support the transition plan relating to the public company, as you have requested.

Based on your summary, and today's email formally putting the company in default and terminating the forbearance agreement, we wanted to provide some applicable commentary and suggest an alternative path forward:

**Current Status of the Public Company**

- Based on the past two fiscal years, in combination with the current fiscal YTD, management is very confident in its assertion that the Company is annualizing at $9M of non-Costco net revenue. As a public company, there are between $750K and $1M of public company costs, in addition to between $800K and $1M to put Directors and Officers insurance in place (if D&O were even possible). This is on top of operational costs, distribution, warehousing and logistics, selling and admin costs, etc. Regardless of what alternative management team is put in place to operate the Company, it would be impossible to achieve enough EBITDA and free cash flow to come close to the amount required to service the $30M of debt under current loan agreements
- The Company had a recent MAE, has very little cash and recognizes that it is in default on all its loan agreements. As such, it has no access to capital, either through the markets or additional debt
- In order to avoid Chapter 7, the Company would need to negotiate material amendments to all loan agreements, which it cannot afford to do from a legal cost and amendment fee basis, nor from the time it would take to complete given the current cash balance and access to additional cash. It also seems apparent the chances of such negotiations being successful are negligible at best
- The Company is no longer a going concern and is essentially bankrupt, thus why the Board passed the Chapter 7 resolution

**Creditor Suggested Path**

- It appears you are suggesting the lenders will take operational control over the public company through the appointment of new officers and a new Board (as the current Board would correctly resign upon the creditors taking de-facto control of the company).
- This will not fix the underlying issue, that being this is a public company that is in default of its loan agreements, has no ability to service debt and no access to the capital markets
- Under these specific circumstances, it would be extremely difficult to attract new Board members, and absolutely impossible to bind a D&O policy
- Even with new management, ALL lenders, (not just senior lenders), would still be obligated to renegotiate the terms of their debt with the Public Company,

such that the Company was no longer in default and the new terms would provide the company a very lengthy runway of little to no interest or principal payments (waivers will not suffice)

- Until such time as that occurs, the company would not be considered a going concern, will not have access to any public capital and will not be able to obtain D&O insurance, while any and all creditors (beyond yourselves) can and would pursue all legal means to collect
- The Company, in the meantime, through newly appointed management, would still be required to meet all of its regulatory obligations as a public company, including continuous disclosure starting with quarterly reporting
- This path does not seem viable, but again, the Company will do whatever it can to support you in the event you wish to proceed.

**Suggested Path**

- We suggest the applicable senior lenders create a "PrivateCo" to purchase the assets of the company for $1.00
- Amend the loans to simply allow the Public Company to assign your applicable debt to "PrivateCo" (no complex renegotiation of terms)
- The Company, its officers and directors are provided a full release from the senior lenders
- Hire new management to run PrivateCo with a transitional services agreement in place with whomever is necessary from the prior Public Company management team
- As a PrivateCo, no Board is required, unless you desire one to be in place through your newly minted shareholders agreement
- D&O becomes MUCH more palatable for providers given the private company, ownership and management structure
- You can amend your loans among yourselves, as applicable
- No public company costs, regulations or reporting requirements
- All other creditors are no longer your issue
- Speed to execution of this path is monumentally better than the public company transition alternative
- Subsequent to the transaction, the Public Company will try its best to work on agreements with all remaining creditors to avoid Chapter 7. If successful, it would look for other alternatives to sell the shell. In this scenario, both ACME and Sanders, as shareholders, would stand to benefit.

We believe this more closely reflects your objectives, which is to maximize the value of the assets, not the value of the public company (although under this scenario, there could still be value for the public company that would not exist as long as it has $30M of debt). It represents a viable path. We believe the public company transition path is simply too complex and does not solve the issues at hand.

Kind regards

Trent

synergy
CHC corp.

**Trent MacDonald** CPA, CA
Senior Advisor

trent@synergychc.com
Phone: 416-230-1126

SYNERGYCHC.COM NASDAQ (SNYR)

FOCUSfactor FLAT TUMMY HAND MD

**From:** Peter Eschmann <peschmann@acmecreditpartners.com>
**Sent:** Monday, August 10, 2026 7:40 PM
**To:** Jack Ross <jack@synergychc.com>
**Cc:** James Gale <james.gale@signethp.com>; Jaime Fickett <jfickett@synergychc.com>; Trent MacDonald CPA CA <trent@synergychc.com>
**Subject:** RE: Requested call

Circling back today on the conversation outlining what was discussed and points that had some alignment/agreement around how a transition would be implemented.

Board - current Synergy board remains in place and discussed how the current board would appoint any new management as well as appointing new board members going forward with the expectation that current Synergy board members would look to step down after those steps are completed. There is an open question on the NASDAQ board requirements on any new potential board members/number of board members

Transition services – we raised the concern on a transition services plan in place for an orderly transition to occur. Personnel to include financial officer/treasury functions. Specific scope and responsibilities to be further defined but shall include assistance around existing cash management, forecasting, and supporting discussions with customers, venders and stakeholders.

Information – lenders need immediate access to all information

Release – Jack to provide Tuesday language on release

D&O insurance – company does not have current a D&O policy; Synergy has received quotes on D&O policies and are available to Synergy. An active D&O policy in place is necessary for any potential third party officer/manager to be engaged by Synergy

Liquidity – Synergy needs additional liquidity to continue to operate. As part of a liquidity plan, lenders are evaluating investing additional capital as part of a transition plan that would require current management also making an investment into liquidity

Last week we made progress on the concept of a transition and we need to refine the details in order to get something documented and implemented to the extent both sides are agreeable. Today's call was to further

define some of the points that are necessary parts of any agreement. I think some progress was made. If you have any comments/views on the above feel free to provide.

---

**From:** Jack Ross <jack@synergychc.com>
**Sent:** Monday, August 10, 2026 8:55 AM
**To:** Peter Eschmann <peschmann@acmecreditpartners.com>
**Cc:** James Gale <james.gale@signethp.com>; Jaime Fickett <jfickett@synergychc.com>; Trent MacDonald CPA CA <trent@synergychc.com>
**Subject:** Re: Requested call

Sure, how about 1pm est

synergy CHC corp.

Jack Ross CHAIRMAN/CEO

jack@synergychc.com
1 (902) 237 1220

SYNERGYCHC.COM NASDAQ (SNYR)

FOCUSfactor FLAT TUMMY HAND MD

On Aug 10, 2026, at 9:32 AM, Peter Eschmann <peschmann@acmecreditpartners.com> wrote:

Jack how about a follow up call this afternoon?

---

**From:** Jack Ross <jack@synergychc.com>
**Sent:** Tuesday, August 4, 2026 3:17 PM
**To:** Peter Eschmann <peschmann@acmecreditpartners.com>; James Gale <james.gale@signethp.com>
**Cc:** Jaime Fickett <jfickett@synergychc.com>; Trent MacDonald CPA CA <trent@synergychc.com>
**Subject:** Requested call

Good Afternoon guys, happy to jump on a call first thing in the morning 9 am est work ?

Jack

synergy CHC corp.

**Jack Ross** CHAIRMAN/CEO

jack@synergychc.com
1 (902) 237 1220

SYNERGYCHC.COM NASDAQ (SNYR)

# EXHIBIT 26

# RELEASE AGREEMENT

This **RELEASE AGREEMENT**, dated as of August [__], 2026 (the "**Effective Date**"), is entered into by and among (a) [______________], an individual resident of [__________] (the "**Releasee**"), (b) Synergy CHC Corp., a Nevada corporation (the "**Borrower**"), (c) the Lenders (as defined below), (d) ACP Agency, LLC ("**ACP**"), and (e) Sanders Morris Harris, LLC ("**Sanders Morris**"), Don A. Sanders ("**Sanders**"), together with Sanders Morris and any other Person(s) at any time or in any manner acquiring any right or interest in any of the original indebtedness of Sanders Morris or Sanders, and any successors and assigns of each such person (each, a "**Subordinated Lender**" and, collectively, the "**Subordinated Lenders**"). Each of the parties listed above in items (b), (c), (d) and (e) is a "**Releasing Party**" and, collectively, the "**Releasing Parties**". The Releasee and each Releasing Party are each referred to herein as a "**Party**" and, collectively, the "**Parties**".

## RECITALS

**WHEREAS**, the Borrower, the lenders from time to time party thereto (the "**Lenders**") and the agents from time to time party thereto (the "**Agents**") are parties to that certain Term Loan Credit Agreement, dated as of May 30, 2025, as amended by that certain First Amendment to Term Loan Credit Agreement, dated as of June 24, 2025, as amended by that certain Second Amendment to Term Loan Credit Agreement, dated as of March 24, 2026, and as amended by that certain Limited Waiver to Term Loan Credit Agreement, dated as of March 24, 2026 (as further amended, restated, supplemented or otherwise modified from time to time, including any replacement agreement therefor, the "**Credit Agreement**");

**WHEREAS**, the Agents have notified the Borrower of certain Events of Default (as defined in the Credit Agreement);

**WHEREAS**, the Subordinated Lenders may have certain rights of default under their indebtedness;

**WHEREAS**, the Releasee is an [officer] [director] [officer and director] of the Borrower;

**WHEREAS**, the Releasee is resigning from all positions with the Borrower at the request of the Releasing Parties (the "**Resignation**") to allow the Lenders, ACP and the Subordinated Lenders to take control of the Borrower to safeguard their respective loans.

**NOW, THEREFORE**, in consideration of the foregoing premises, the promises and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## AGREEMENT

1. **Resignation**. As of the Effective Date, the Releasee hereby tenders his or her Resignation and covenants that he or she has received all compensation due from the Borrower and has no claims against the Borrower other than for indemnification for claims made by third parties as provided in the Borrower's governing corporate documents.

2. **Sole Lender**. Acme Credit Partners Fund I, LP represents and warrants that it is the sole Lender and that no other party has any rights to any indebtedness owed by the Borrower to any Lender under the Credit Agreement. Sanders and Sanders Morris represent and warrant that they have the authority to act on behalf of each of the Subordinated Lenders and covenant that they are providing the release below on behalf of each such Subordinated Lender.

3. **Release**. To the fullest extent permitted by applicable law, each Releasing Party forever releases, waives, acquits and discharges the Releasee from all known and unknown claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts, penalties, fees, expenses (including attorneys' fees and costs actually incurred), and punitive damages of any nature whatsoever, whether apparent, yet to be discovered, or that may hereafter develop, that such Releasing Party has, may hereafter have, or may have had against the Releasee for any of the Releasee's acts or omissions arising out of or relating to any period prior to the Effective Date in connection with the indebtedness owned by the Lenders and Subordinated Lenders, the Credit Agreement, the operation of the Borrower, the Releasee's service as an officer and/or director of the Borrower and any other matter whatsoever (collectively, the "Released Claims"), provided that such release does not apply to the non-disparagement provisions set forth in Section 4 hereof or to any claim or right that cannot be released as a matter of applicable law. Each Releasing Party further covenants that he, she or it will not, directly or indirectly, commence, file, institute, prosecute, maintain or voluntarily assist or participate in any suit, action, arbitration, administrative proceeding, claim or demand in any jurisdiction against the Releasee based on any Released Claim, provided that the foregoing will not prohibit truthful testimony or production of documents required by subpoena, court order or other compulsory legal process, the filing of a charge or communication with any governmental or regulatory authority to the extent such activity cannot lawfully be restricted, or any Party's right to enforce this Agreement.

4. **Non-Disparagement**. Each Party agrees that it will not make or publish, verbally or in writing, any negative, derogatory or disparaging statements concerning any other Party, any affiliate of any other Party or any of their respective successors, assigns, officers, directors, managers, partners or employees.

5. **Miscellaneous**.

(a) **Further Assurances**. At the request of a Party made from time to time after the Effective Date, and without further consideration, each other Party shall execute and deliver such other agreements, instruments, certifications, or documents as may be reasonably appropriate to effectuate or evidence the transactions contemplated by this Agreement.

(b) **Entire Agreement**. This Agreement, including its Recitals, which are incorporated herein, constitutes the sole and entire agreement of the Parties with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.

(c) **Governing Law**. This Agreement and any dispute, claim, or cause of action arising therefrom or relating thereto in any way shall be governed by and construed in accordance with the internal laws of the State of Nevada without giving effect to any choice or conflict of law

provision or rule (whether of the State of Nevada or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Nevada.

(j) **Fees**. In any action or suit to enforce any right or remedy under this Agreement or to interpret any provision of this Agreement, the prevailing party shall be entitled to recover its reasonable attorneys' fees, costs and other expenses from the non-prevailing party.

(k) **Severability**. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

(l) **Counterparts**. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[Signature page follows]

The Parties have executed this Agreement as of the Effective Date.

[NAME OF RELEASEE]

By:____________________________

**ACP AGENCY, LLC**

By:_____________________________
Name: Peter Eschmann
Title: Authorized Person

**ACME CREDIT PARTNERS FUND I, LP**

By: Acme Credit Investors LLC, its general partner

By: Acme Credit Partners LLC, its managing member

By: _______________________________
Name: Peter Eschmann
Title: Managing Partner

**Synergy CHC Corp.**

By: ________________________________________
Name:_______________________________________
Title:_______________________________________

**Don A. Sanders**, individually

By:______________________________

**SANDERS MORRIS HARRIS, LLC**, individually and in its capacity as representative of the noteholders, as Subordinated Lenders

By:____________________________
Name:
Title:

# EXHIBIT 27

**Ariel Hayes**

**From:** Trent MacDonald, CPA, CA <trent@synergychc.com>
**Sent:** Wednesday, August 19, 2026 9:34 AM
**To:** Peter Eschmann
**Cc:** Jaime Fickett; Jack Ross; Anthony Galan
**Subject:** Re: DACA

**WITHOUT PREJUDICE**

Hi Peter,

As just iterated, the Company is aware of the actions you can and have taken under the loan and related agreements.

As also stated, several times and in several communications, the Company is willing to transition control to the lenders, which would include control under the DACA, upon the receipt of unconditional releases.

Please let us know how you wish to proceed in relation to the possible paths forward and if releases will or will not be forthcoming.

Kind regards

Trent

synergy
CHC corp.
Trent MacDonald CPA, CA
Senior Advisor
trent@synergychc.com
Phone: 416-230-1126
SYNERGYCHC.COM NASDAQ (SNYR)
FOCUSfactor FLATTUMMY HAND MD

**From:** Peter Eschmann <peschmann@acmecreditpartners.com>
**Sent:** Wednesday, August 19, 2026 9:16 AM
**To:** Trent MacDonald, CPA, CA <trent@synergychc.com>
**Cc:** Jaime Fickett <jfickett@synergychc.com>; Jack Ross <jack@synergychc.com>; Anthony Galan <agalan@acmecreditpartners.com>
**Subject:** RE: DACA

Company is required to provide lender access to the account under the DACA – this should be done this morning.

---

**From:** Trent MacDonald, CPA, CA <trent@synergychc.com>
**Sent:** Wednesday, August 19, 2026 8:57 AM
**To:** Peter Eschmann <peschmann@acmecreditpartners.com>
**Cc:** Jaime Fickett <jfickett@synergychc.com>; Jack Ross <jack@synergychc.com>; Anthony Galan <agalan@acmecreditpartners.com>
**Subject:** Re: DACA

**WITHOUT PREJUDICE**

Hi Peter

The Company is aware and understands you have several possible actions you can take under the loan and related agreements, some of which you have now taken (ie. Formal notice of default, termination of the forbearance agreement, and now exercise of your rights under the control agreement).

Per prior email communication, you said you'd be providing a response to the Company's suggested path forward once the draft release was sent. You've had the draft release since Thursday morning of last week, yet we are still awaiting your response. Also, while the Company has provided a great deal of feedback on the plan you put forward, there have been no comments nor responses from ACME in that regard. Even so, we've communicated that if you did wish to proceed with taking control of the public company, the Company would agree and assist in the transition upon receiving the aforementioned signed releases.

Please let us know how you wish to proceed in relation to these possible paths forward and if releases will or will not be forthcoming.

Regards

Trent

synergy
CHC corp.

**Trent MacDonald** CPA, CA
Senior Advisor

trent@synergychc.com
Phone: 416-230-1126

SYNERGYCHC.COM NASDAQ (SNYR)

FOCUSfactor FLAT TUMMY HAND MD

**From:** Peter Eschmann <peschmann@acmecreditpartners.com>
**Sent:** Tuesday, August 18, 2026 4:12 PM
**To:** Jaime Fickett <jfickett@synergychc.com>
**Cc:** Anthony Galan <agalan@acmecreditpartners.com>
**Subject:** DACA

As you know we have exercised our right of control over the bank account at Banc of California. As per the DACA, Synergy is required to provide Acme with read only access to the account (see section 10) and Acme is requesting access.

We are available to discuss the change and how to process funding requests going forward, presumably tomorrow.

**Peter Eschmann**

**ACME CREDIT PARTNERS**
600 Lexington Ave, 14th Floor
New York, NY 10022
**O:** (646) 357-8385 | **M:** (516) 263-2794
**W:** ACMECreditPartners.com

ACME
CREDIT PARTNERS

# EXHIBIT 28

**ACP AGENCY, LLC**
c/o Acme Credit Partners, LLC
600 Lexington Ave, 14th Floor
New York, New York 10022

August 25, 2026

**VIA EMAIL AND CERTIFIED MAIL**

Synergy CHC Corp.
Synergy CHC Inc.
Hand MD Corp.
P.O. Box 22
Sebago, ME 04029
Attention: Jack Ross
Email: jack@synergychc.com

**Re: Notice of Acceleration**

Ladies and Gentlemen:

Reference is made to (i) that certain Term Loan Credit Agreement, dated as of May 30, 2025, by and among Synergy CHC Corp., a Nevada corporation, as borrower (the "**Borrower**"), together with each other direct or indirect subsidiary of the Borrower listed as a "Guarantor" on the signature pages thereto (together with each other Person that executes a joinder agreement and becomes a "Guarantor" thereunder, each a "**Guarantor**" and collectively, the "**Guarantors**", and, together with the Borrower, each a "**Loan Party**" and collectively, the "**Loan Parties**"), ACME Credit Partners Fund I, LP, as lender (in such capacity and together with its successors and assigns in such capacity, the "**Lender**"), ACP Agency, LLC ("**ACP**"), as administrative agent for the Lender (in such capacity, together with its successors and assigns in such capacity, the "**Administrative Agent**"), and ACP, as collateral agent for the Lender (in such capacity, together with its successors and assigns in such capacity, the "**Collateral Agent**", and, together with the Administrative Agent, each, an "**Agent**" and collectively, the "**Agents**"), as amended by that certain First Amendment to Term Loan Credit Agreement, dated as of June 24, 2025, that certain Second Amendment to Term Loan Credit Agreement, dated as of March 24, 2026, and that certain Limited Waiver to Term Loan Credit Agreement, dated as of March 24, 2026 (as so amended and as otherwise amended, restated, supplemented or otherwise modified from time to time, including any replacement agreement therefor, the "**Credit Agreement**"); (ii) that certain Forbearance Agreement, dated as of May 28, 2026 (the "**Forbearance Agreement**"), by and among the Borrower, the Guarantors, the Lenders party thereto and the Agents; and (iii) that certain Notice of Events of Default; Notice of Forbearance Termination Event; Reservation of Rights, from the Agents and the Lender to the Borrower, dated August 11, 2026 (the "**Default Notice**"). Any capitalized term used herein and not otherwise defined herein is used herein as defined in the Credit Agreement or the Forbearance Agreement, as applicable.

Pursuant to the Default Notice, the Agents notified the Loan Parties that (i) the Specified Events of Default (as defined therein) have occurred and are continuing under the Credit Agreement; (ii) the Forbearance Period terminated and the Forbearance Termination Time occurred on August 6, 2026, and the Forbearance is of no further force or effect; and (iii) the Agents and the Lender are entitled to exercise any and all of their respective rights and remedies under the Credit Agreement and the other Loan Documents.

Pursuant to the Default Notice, the Agents and the Lender also notified the Loan Parties that (i) interest at the Post-Default Rate would be charged on all Obligations of the Loan Parties under the Credit Agreement and the other Loan Documents from November 12, 2025, being the date of the occurrence of the first Specified Event of Default, and (ii) the Forbearance Fee, in the amount of $404,173.06, became due and payable upon the occurrence of the Forbearance Termination Time on August 6, 2026, which Forbearance Fee has not been paid. Pursuant to Section 1.C(x) of the Forbearance Agreement, such failure to pay the Forbearance Fee constitutes an immediate Event of Default under the Credit Agreement, and such failure separately constitutes an Event of Default under Section 8.1(a)(i) of the Credit Agreement, the three (3) Business Day cure period provided for therein having expired (the "**Forbearance Fee Event of Default**").

The Specified Events of Default and the Forbearance Fee Event of Default (collectively, the "**Existing Events of Default**") continue to exist and have not been waived in writing in accordance with the terms of the Credit Agreement. In addition to the Existing Events of Default, other Defaults or Events of Default may have occurred and be continuing of which the Agents and the Lender are not aware. Neither the identification of the Existing Events of Default herein or in the Default Notice, nor the exercise of any right, power, privilege or remedy on account thereof, shall be construed as a waiver of, or an election of remedies with respect to, any other Default or Event of Default, whether now existing or hereafter arising, or as a representation by any Agent or the Lender that no other Default or Event of Default has occurred and is continuing.

Pursuant to Section 8.1 of the Credit Agreement, the Collateral Agent, at the request and direction of the Required Lenders, hereby gives notice that, on account of the Existing Events of Default, and effective as of the date hereof: (i) all Commitments, including the Delayed Draw Term Loan Commitments, are hereby terminated; (ii) the aggregate principal of all Loans, all accrued and unpaid interest thereon, all fees and all other amounts payable under the Credit Agreement and the other Loan Documents, including, without limitation, the Applicable Premium and the Forbearance Fee, are declared to be accelerate and due and payable immediately, without presentment, demand, protest or further notice of any kind; and (iii) the Agents and the Lender may exercise any and all of their other rights and remedies under applicable law, the Credit Agreement and the other Loan Documents. The acceleration effected hereby constitutes an Applicable Premium Trigger Event under clause (b) of the definition thereof.

Accordingly, the Agents hereby demand immediate payment in full in cash of all Obligations, which as of August 21, 2026 aggregate to not less than $18,898,424.70, consisting of (i) $17,510,699.64 of outstanding principal, (ii) $633,338.01 of accrued and unpaid interest, including interest at the Post-Default Rate, (iii) the Applicable Premium in the amount of

$350,213.99, and (iv) the Forbearance Fee in the amount of $404,173.06 together with all fees, costs and expenses payable pursuant to Section 11.4 of the Credit Agreement, in each case together with interest continuing to accrue at the Post-Default Rate and all other fees, costs, expenses, indemnities and other amounts payable under the Loan Documents. Additionally, the Obligations having been accelerated as set forth above, the Guaranteed Obligations are due and payable in full, and the Agents hereby demand that each Guarantor immediately pay in full in cash the Guaranteed Obligations, together with all expenses payable pursuant to Section 10.1 of the Credit Agreement. Payment is to be made to the Administrative Agent's Account.

The Agents and the Lender reserve all of their other respective rights and remedies under the Credit Agreement, the other Loan Documents and applicable law. Neither the Agents' nor the Lender's failure to exercise, or delay in exercising, any right, power, privilege or remedy under the Credit Agreement or any other Loan Document or under any applicable law shall operate as a waiver thereof or waive, affect or diminish any right of any Agent or the Lender.

Although the Borrower and the other Loan Parties have been informed of the matters set forth herein, none of the Agents or the Lender has any further obligation to provide the Borrower or any other Loan Party with notice of the matters set forth herein, nor shall the provision of such notice herein to the Borrower and the other Loan Parties be construed as an agreement to inform any of them of such matters or any other matters in the future.

Enclosed please find the Agents' Notices of Intention to Enforce Security, which are served upon the Borrower and Hand MD Corp. pursuant to section 244(1) of the *Bankruptcy and Insolvency Act* (Canada).

[Remainder of page intentionally left blank.]

Very truly yours,

**ADMINISTRATIVE AGENT AND COLLATERAL AGENT:**

**ACP AGENCY, LLC**

By: ______________________________
Name: Peter Eschmann
Title: Authorized Person

**LENDER:**

**ACME CREDIT PARTNERS FUND I, LP**
By: Acme Credit Investors LLC, its general partner
By: Acme Credit Partners LLC, its managing member

By: ______________________________
Name: Peter Eschmann
Title: Managing Partner

cc: Nelson Mullins Riley & Scarborough LLP
One Financial Center, Suite 3500
Boston, MA 02111
Attention: James W. Bartling, Esq.
Email: jim.bartling@nelsonmullins.com

# EXHIBIT 29

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# FORM 8-K

## CURRENT REPORT
**Pursuant to Section 13 or 15(d) of the**
**Securities Exchange Act of 1934**

Date of Report (Date of earliest event reported): August 25, 2026

**SYNERGY CHC CORP.**
(Exact name of registrant as specified in its charter)

| **Nevada** | **001-42374** | **99-0379440** |
|---|---|---|
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| **770 Roosevelt Trail STE 8 #1016, N. Windham, Maine** | **04062** |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: **(207) 321-2350**

N/A
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| **Common Stock, par value $0.00001 per share** | **SNYR** | **The Nasdaq Stock Market LLC** |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (17 CFR § 230.405) or Rule 12b-2 of the Securities Exchange Act of 1934 (17 CFR § 240.12b-2).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 2.04. Triggering Events That Accelerate or Increase a Direct Financial Obligation**

On August 25, 2026, Synergy CHC Corp. (the "Company") received a Notice of Acceleration (the "Acceleration Notice") from ACP Agency, LLC ("ACP"), as administrative agent and collateral agent under the Company's Term Loan Credit Agreement, dated as of May 30, 2025, as amended (the "Credit Agreement"). The Acceleration Notice states that, following the Events of Default previously disclosed by the Company in its Current Report on Form 8-K filed on August 11, 2026, ACP, at the direction of the required lenders, has exercised remedies under the Credit Agreement.

Pursuant to the Acceleration Notice, ACP notified the Company that all commitments under the Credit Agreement have been terminated and that all obligations outstanding under the Credit Agreement and the related loan documents have been accelerated and declared immediately due and payable.

The Acceleration Notice further states that, as of August 21, 2026, approximately $18.9 million was immediately due and payable under the Credit Agreement and related loan documents, exclusive of additional interest, fees, costs and expenses that continue to accrue.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Date: August 26, 2026

**SYNERGY CHC CORP.**

By: */s/ Jack Ross*
Name: Jack Ross
Title: Chief Executive Officer